38 F.3d 1216
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Grunda LEWIS, individually, as Mother, Next of Kin, and
Administratrix of the Estate of John Thomas Lewis,
Jr. Plaintiff-Appellant,
v.
JEFFERSON COUNTY POLICE DEPARTMENT; Bobby Crouch; Leon E.
Jones, Sr.; Larry Bush; Harvey I. Sloane; David L.
Armstrong; Irvin G. Maze; Chris Gorman; Darryl T. Owens;
Jefferson County, Kentucky, Defendants-Appellees.
 No. 93-6287.
 United States Court of Appeals, Sixth Circuit.
 Oct. 21, 1994.
 
 Before: GUY and BATCHELDER, Circuit Judges; and McCALLA, District Judge.*
 PER CURIAM.
 
 
 1
 John Thomas Lewis, Jr., was shot and killed by a Jefferson County, Kentucky, police officer. Plaintiff, the mother of Lewis, brought this civil rights action against the officer as well as the municipality and some of its officials. The district court granted summary judgment in favor of defendants, dismissing plaintiff's state and federal claims. For the following reasons, we affirm.
 
 I.
 
 2
 On November 20, 1989, a Pizza Hut restaurant in Louisville, Kentucky, received a phone-in order from an individual who identified himself as "John Jones." This individual asked that his order be delivered to the Robinwood section of Louisville. Claiming that he did not have a phone, the individual did not provide a phone number. Upon arriving at the designated location, the Pizza Hut employee who delivered the order, instead of meeting John Jones, was confronted by two black males, who robbed the employee at gunpoint using what appeared to be an assault rifle. The robbery, which netted the robbers the employee's wallet and the cash he had on hand, was reported to the Jefferson County Police Department ("JCPD").
 
 
 3
 The following evening the same Pizza Hut restaurant received a phone-in order from a "John Jones" who claimed not to have a phone. This John Jones, whose voice matched that of the John Jones of the night before, requested that his order be delivered to an address near the location at which the previous night's robbery had occurred.
 
 
 4
 The restaurant responded to the order by contacting the JCPD, which, in turn, quickly formulated a plan to capture the culprits. Devised by Sergeant Gerald Owen, the plan called for a police officer to pose as the deliveryman. This officer, it was hoped, would be able to make an arrest (with the assistance of other support officers) in the event he was held up during the course of the delivery. Other department detectives and officers, Larry Bush among them, were deployed in the area to help prevent an escape and otherwise assist the operation. A two-year veteran of the force, Bush was paired with detective Terry Jones, who was driving an unmarked police car. While Jones was wearing civilian clothes, Bush was in his uniform. In order that he not appear conspicuous, Bush was instructed to conceal his uniform while he rode in Jones's car.
 
 
 5
 While driving in the vicinity of the delivery location, Jones and Bush spotted an individual carrying what appeared to be a long gun. At his deposition, Bush explained: "I saw running away from me in a west direction a black male wearing a red shirt, blue jeans. In his right hand he had a jacket which was draped over what appeared to be a long gun. You could see the stock sticking out on the back side." (App. 171.) Jones and Bush then received a radio transmission informing them that this individual had entered a nearby apartment building. Evidently, the JCPD aborted Owen's plan at this point "and the focus of the police shifted to locating this apparently armed individual."
 
 
 6
 Jones parked his car in a position where he and Bush could observe the building. Soon thereafter, they received another radio transmission notifying them that an individual--who apparently was not carrying a rifle or any object resembling a rifle--had exited the building and was running in the direction of a parked car. Jones and Bush observed this individual get into that car. Bush believed this individual was the man he and Jones had seen moments earlier.
 
 
 7
 While Jones and Bush converged on the parked car from one direction, Owen, in a separate vehicle, came from another direction. Both vehicles were flashing their police lights. The officers exited their vehicles and approached the car. Bush determined that there were three people inside the car and that these people were behaving somewhat suspiciously. As he recounted, "there was a lot of exaggerated head movement[ ]" and "all this head bobbing.... [I]t was as if they were reaching down in the seat or putting something underneath the seat or grabbing something from underneath the seat." (App. 197).
 
 
 8
 During his deposition, Bush offered the following account of the events that transpired next. Bush drew his weapon and ordered the occupants of the car to "hold it right there." (App. 201.) Rather than heed Bush's command, the suspect--the same individual who had led the police to the car (and whom Bush had initially suspected of carrying a concealed rifle)--emerged from the right front seat of the car. The manner in which the suspect exited the car--sideways, as to conceal his front from Bush--led him (Bush) to assume that the suspect "was probably carrying a gun in his waistband." (App. 214.) Immediately upon exiting the car, the suspect attempted to flee the scene. Bush ordered the suspect to stop and repeated the order as he began to pursue the suspect. Both times Bush was ignored. According to Bush, a few seconds later, "I heard Sergeant Owens' voice say, shoot him. At the same time that that voice was saying that, I saw the guy that I was chasing go from a pumping action with his arms to reaching to his waistline in front and turn on me as if he was trying to shoot me." (App. 223.) Bush then fired a single shot from a distance of approximately 10 yards into the right side of the suspect, fatally wounding him. The suspect was later identified as John Thomas Lewis, Jr.
 
 
 9
 The JCPD subsequently conducted an internal investigation into the shooting. As a result of this investigation, which determined that Bush used excessive force in violation of the department's standard operating procedures, Bush's employment with the department was terminated.
 
 
 10
 Plaintiff, Grunda Lewis, initiated the instant action in Kentucky state court. Her complaint listed several tort claims in addition to alleging violations of federal civil rights laws. Named as defendants were Bush, Jefferson County, the Jefferson County Police Department, and several of the county's past and current officials. With the exception of Bush, who was sued in his individual and official capacities, all county officials were sued in their official capacities only. The case was removed to federal court. Bush and the municipality filed separate answers and motions for summary judgment. Plaintiff, too, filed a motion for summary judgment. The district court referred the case to a magistrate judge, who recommended that the summary judgment motions of Bush and the municipality be granted. The district court adopted the magistrate judge's recommendations, thereby dismissing plaintiff's complaint. This appeal followed.
 
 II.
 
 11
 We review a district court's grant of summary judgment de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). We examine the grant of summary judgment to determine " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310 (6th Cir.1989). Although we must draw all justifiable inferences in favor of the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), there must be a disagreement regarding an item of material fact. Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir.1986). The evidence presented must be sufficient to permit the plaintiff to recover if it is accepted by the jury.
 
 
 12
 Plaintiff first takes issue with the district court's decision to grant Bush's summary judgment motion.[1] In this regard, plaintiff notes that Lewis had not committed a crime as of the time he was shot. Moreover, he was unarmed and surrounded by not only nine JCPD officers on the ground, but also a helicopter above. As such, plaintiff submits that Lewis could not have presented a threat of physical injury to Bush or anyone else. Plaintiff also observes that Bush was fired because of the JCPD's determination that his use of force was excessive.
 
 
 13
 Two Supreme Court cases are critical to plaintiff's argument. See Graham v. Connor, 490 U.S. 386 (1989); Tennessee v. Garner, 471 U.S. 1 (1985). In Garner, the Court held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. at 11. See also id. at 8-9 (The question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure.").[2] In Graham, the Court made clear that excessive force claims are evaluated under the "objective reasonableness" standard of the Fourth Amendment. The Graham Court stressed, however, that " '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application[.]' " 490 U.S. at 396 (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)). Instead, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.
 
 
 14
 In reviewing the district court's decision as to Bush, we are mindful of the following caveat, which the Graham Court attached to its discussion of "objective reasonableness":
 
 
 15
 The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
 
 
 16
 Id. at 396-97. This court provided its own gloss on this aspect of the Graham decision in Smith v. Freland, 954 F.2d 343, 347 (6th Cir.), cert. denied, 112 S.Ct. 1954 (1992):
 
 
 17
 Thus, under Graham, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.
 
 
 18
 Judged against this backdrop, we are persuaded that Bush did not act unreasonably in shooting at Lewis under these circumstances. The chase that resulted in the shooting lasted approximately five seconds and required a reflex-like decision that, though regrettable in retrospect, was not unreasonable under the circumstances. Bush fired the shot that killed Lewis believing, reasonably in our estimation, that Lewis was in the process of turning around to fire at Bush. That Lewis clearly was not wielding a rifle at the time does not alter our conclusion; his suspicious behavior in the parked car just moments earlier gave Bush the impression that perhaps Lewis had obtained a handgun while in the car.
 
 
 19
 Also immaterial to our analysis is the fact that Lewis was surrounded by other police officers. See Smith, 954 F.2d at 347 ("The fact that the vehicle was 'totally surrounded' by police does not change matters; had [the suspect] in fact retrieved a gun from his seat, he could have caused injury or death despite the presence of numerous police officers.") (quoting Reese v. Anderson, 926 F.2d 494, 501 (5th Cir.1991)). Moreover, the disciplinary action taken against Bush by the JCPD in the aftermath of the shooting is not dispositive in plaintiff's favor. On this point, we have remarked:
 
 
 20
 Under Sec. 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force. A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under Sec. 1983. To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense.
 
 
 21
 Smith, 954 F.2d at 347-48.
 
 
 22
 In light of our determination that Bush acted reasonably under the circumstances, we need not address the failure-to-train claim plaintiff asserts against the municipality or the claims against the other defendants.
 
 
 23
 AFFIRMED.
 
 
 
 *
 The Honorable Jon P. McCalla, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 On this point, the magistrate judge concluded:
 [T]he court has considered the totality of circumstances revealed by the body of uncontradicted material facts. The officers of the JCPD were investigating a robbery that had occurred the night before in which at least one firearm was brandished. The officers had every reason to believe that suspects in the parking lot might be armed. The actions of the decedent, John Thomas Lewis, Jr., could reasonably give rise to the suspicion that he was armed and not willing to submit to an investigatory stop by Officer Bush and his fellow officers. It is not relevant to our consideration of the issue before the Court that Mr. Lewis was later discovered to be unarmed. Likewise, it is of no import in our consideration of whether the constitutional rights of the deceased were violated or that the actions of Officer Bush may or may not have violated the policies and guidelines of the JCPD.... Officer Bush reasonably believed that the suspect was armed, that he was collecting a firearm from his waistband during the footchase, and that he was turning to confront the officer immediately before the shooting. Officer Bush was not unreasonable in forming the belief that Mr. Lewis posed an immediate and deadly threat to the officer. The tragic effects of the shooting on all persons involved is not lost on the magistrate judge. That, however, cannot change the fact that officer Bush must be found, based upon the totality of the circumstances, to have acted reasonably in using deadly force against the plaintiff's son.
 Because Officer Bush acted reasonably in the use of deadly force against Mr. Lewis, the latter's constitutional rights were not violated by the former.
 (App. 45-46.)
 
 
 [2]
 Although we cite to "fleeing felon" cases because they contain much of the law in the area, this is not a classic escape case scenario. Although the decedent was fleeing, he was not shot because of that fact or the risk he might present to others if not apprehended. This is more correctly analyzed as a case in which an officer felt his own life was suddenly at risk and we are called upon to evaluate the objective reasonableness of his response